IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

NICHOLE T. TAYLOR,

                          Plaintiff,

          vs.                                    Civil Action No.
                                                 3:05-CV-1444 (LEK/DEP)

MICHAEL J. ASTRUE, Commissioner
of Social Security,[1]

                          Defendant.

---

APPEARANCES:                        OF COUNSEL:

FOR PLAINTIFF:

HINMAN, HOWARD LAW FIRM             EUGENE FAUGHNAN, ESQ.
P.O. Box 5250
80 Exchange Street
700 Security Mutual Building
Binghamton, NY 13902-5250

FOR DEFENDANT:

HON. GLENN T. SUDDABY               WILLIAM H. PEASE, ESQ.
United States Attorney for the      Assistant U.S. Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton Street
Syracuse, NY 13261-7198

OFFICE OF GENERAL COUNSEL           BARBARA L. SPIVAK, ESQ.

---

    [1]     Plaintiff's complaint, which was filed on November 18, 2005, named Jo
Anne B. Barnhart, the former Commissioner of Social Security, as the defendant.  On
February 12, 2007, Michael J. Astrue took office as Social Security Commissioner.  He
has therefore been substituted as the named defendant in this matter pursuant to Rule
25(d)(1) of the Federal Rules of Civil Procedure, and no further action is required in
order to effectuate this change.  See 42 U.S.C. § 405(g).

Social Security Administration
26 Federal Plaza
New York, NY 10278

Chief Counsel, Region II

SIXTINA FERNANDEZ, ESQ.
Assistant Regional Counsel

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

     Plaintiff Nichole T. Taylor, who suffers from various physical conditions including irritable bowel syndrome ("IBS"), gastroesophageal reflux disease ("GERD"), back and leg injuries, psychosis, disassociation, bipolar disorder, depression, panic attacks, and post traumatic stress disorder ("PTSD"), has commenced this proceeding seeking judicial review of the denial of her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") payments under the Social Security Act, based upon an administrative finding that she was not disabled at the relevant times.  Plaintiff maintains that in finding no disability, the administrative law judge ("ALJ") assigned by the agency to hear and decide the matter erred in a number of ways, including by 1) misinterpreting and/or failing to give controlling weight to opinions of her treating physician; 2) failing to consider the extent of the non-exertional limitations imposed by her mental conditions; 3) failing to properly

determine plaintiff's residual functional capacity ("RFC"), in the process ignoring her exertional restrictions and failing to engage in a function-by-function analysis; and 4) relying upon opinions of a vocational expert which were based upon an unsupported hypothetical that did not approximate plaintiff's circumstances.

Having considered the Commissioner's determination in light of plaintiff's arguments, applying the requisite, deferential standard, I find that it resulted from the application of proper legal principles and is supported by substantial evidence.

I.    BACKGROUND

Plaintiff was born in 1982; at the time of issuance of the ALJ's determination in this matter, she was twenty-two years old.  Administrative Transcript at 75, 378.[2]  While in the past she has lived with others, including her brother and his girlfriend, see AT 364, 381-82, during the period relevant to her claim for benefits plaintiff lived with her parents in Johnson City, New York.[3]  AT 77, 378.  Plaintiff graduated from high

_____

[2]    Portions of the administrative transcript filed by the Commissioner in the action, Dkt. No. 4, and comprised of proceedings and evidence before the agency, will be cited herein as "AT ___."

[3]    Plaintiff testified that while in the past she lived with others, it became too hard to be responsible for her own well-being in those settings.  AT 381-82.

school, but did not attend college. [4]  AT 91, 378.

Plaintiff has not worked since September or October of 2004; prior to that date she was employed briefly as a housekeeper.[5]  AT 378-79. Prior to that date, plaintiff worked as a dietary aid in a nursing home and a local hospital, and as a food service worker in a café.  AT 86, 102, 112, 141, 150.

The limitations of which plaintiff complains arise chiefly from her various diagnosed mental conditions.  The record reflects that plaintiff received mental health counseling dating back as early as 1994 and 1995, although the interventions intensified at age seventeen, when plaintiff was in the eleventh grade, following the death of her brother, a boyfriend, and another acquaintance, all in the 1999-2000 timeframe.  AT 175.  Plaintiff voluntarily admitted herself into the Binghamton General Hospital in November of 2000, complaining of feelings of depression and homicidal

_____

[4]      In August of 2004, plaintiff considered entering college the following spring.  AT 364.  There is no record, however, that she actually attended college at any time.

[5]      In her applications for benefits, plaintiff claimed that she became unable to work due to her disability on May 12, 2003.  During her hearing plaintiff could not recall why she selected that onset date.  AT 379.

and suicidal ideations.[6]  AT 175-84.  During her three day stay at the

hospital plaintiff was treated utilizing various therapies and medical

management.  AT 176.  Plaintiff was discharged on November 15, 2000,

against medical advice, with a discharge diagnosis mixed bipolar disorder,

PTSD, and cannabis dependence, and assigned with a global assessment

of functioning ("GAF") score of 50.[7]  *Id.*  To address her condition, plaintiff

was prescribed Remeron, Effexor, and Zyprexa.  AT 177.

Following her hospitalization plaintiff continued to receive medical

and mental health treatment from several sources, including Dr. Louis

Mateya, Jr., of United Medical Associates, who appears to have been her

general practitioner consulted to address various of her physical

impairments including, *inter alia,* IBS; Dr. Lilliam Villasobos, a professional

---

[6]     Notes of plaintiff's hospitalization at the Binghamton General Hospital reflect that plaintiff recounted a history of auditory and visual hallucinations dating back to when she was nine years old, and additionally that her mother also had a history of paranoid delusions and had been diagnosed with bipolar disorder.  AT 175.

[7]     The Global Assessment of Functioning ("GAF") scale considers psychological, social, and occupational functioning on a hypothetical continuum of mental health.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (American Psychiatric Association, 4th Ed. Text Revision 2000) ("DSM-IV-TR").  A GAF score between 41 and 50 indicates the existence of severe mental health symptoms or serious impairments in social, occupational or school functioning.  DSM-IV-TR 34.  While plaintiff's GAF was within this range at the end of her hospitalization, in his discharge summary Dr. Guillen noted that in the past year, plaintiff had received a GAF score of 60, which indicates the existence of moderate mental health symptoms or moderate difficulties in social, occupational or school functioning.  AT 176.

with the Office of Vocational and Educational Services for Individuals with Disabilities ("VESID"); licensed clinical social worker ("CSW") Karen Marganas; and Dr. Mariano Apacible, a staff psychiatrist with the Broome County Community Mental Health Services.  On November 27, 2001, plaintiff was seen by Dr. Villasobos, who diagnosed her as suffering from major depressive disorder as well as panic disorder with agoraphobia.  AT 185-86.  As a result of that visit, Dr. Villasobos assessed a GAF score of 60, and prescribed Depakote, Serzone, and Zyprexa, noting that plaintiff was functioning well and advising that she could work on a part-time basis.  *Id.*

At a subsequent therapy session with CSW Marganas on April 18, 2002, plaintiff reported that she was feeling good, sleeping better, and able to manage her money.  AT 200.  In a follow-up session on May 10, 2002, however, it was noted that plaintiff's affect was blunted and her mood depressed, though insight and judgment were good and there was no evidence of her suffering from any delusions.  *Id.*  On May 13, 2002 plaintiff was diagnosed with major depression, and assessed a GAF score of 60.  AT 198.

On June 2, 2003, Dr. Mariano Apacible completed a state agency

form concerning plaintiff's conditions.  AT 281-87.  In it, Dr. Apacible

reported that based upon his evaluation and treatment of the plaintiff, she

appeared calm and cooperative, her thoughts were disorganized but her

affect was appropriate, she was sad at times, she was oriented and had

fair knowledge, she could do simple calculations, and her judgment was

fair.  AT 283-84.  Dr. Apacible also stated that plaintiff had no suicidal

features, could handle payment benefits, and was able to follow simple

directions, and that her concentration and persistence could be limited at

times due to depression, additionally noting that she only kept to her

friends and could not handle a full time job.  AT 285-86.

Dr. Kusum Walia, a state agency medical consultant, completed a

mental RFC assessment regarding the plaintiff on July 30, 2003.  AT 213-

14.  Dr. Walia examined twenty categories of mental functioning; of those,

it was found that plaintiff had moderate limitations in sixteen.  AT 213-

213A.  Dr. Walia concluded that plaintiff was not significantly limited in

four categories, including the ability to 1) remember locations and work-

like procedures; 2) understand and remember very short and simple

instructions; 3) carry out very short and simple instructions; and 4)

maintain socially appropriate behavior and to adhere to basic standards of

neatness and cleanliness.  *Id.*  The same day, Dr. Walia also completed a

psychiatric review technique form.  AT 216-27.  In it, Dr. Walia reported

that plaintiff had medically determinable impairments that did not fit the

diagnostic criteria, including depression, personality disorder, and

substance abuse.  AT 219, 223-24.  Dr. Walia further opined that plaintiff

had mild restrictions in activities of daily living and moderate difficulties in

maintaining social functioning, concentration, persistence, or pace.  AT

226.  It was further noted that there was insufficient evidence to determine

whether plaintiff had repeated episodes of deterioration.[8]  *Id.*

On December 4, 2003, Dr. Apacible completed another state agency

form concerning plaintiff's conditions.[9]  AT 270-75.  By that time the

plaintiff, who until then continued to treat with professionals at the Broome

County Mental Health Department on a regular basis, had been placed on

Seroquel as part of her medication regimen.  AT 276.  Dr. Apacible opined

that plaintiff's affect was appropriate, mood was sad and depressed at

times, she was oriented, memory was intact, she could do simple

---

[8]     Dr. Walia also found that there was insufficient evidence to establish the presence of the "C" criteria of the controlling listing of presumptively disabling impairments.  AT 227.

[9]     In that assessment, Dr. Apacible referenced evaluations and treatment notes from August 2002 through December 4, 2003.   AT 270; *see* 276-80.

calculations, judgment was fair, there were no suicidal features present, and she was capable of handling payment benefits.  AT 272-73.  Dr. Apacible also found that Taylor had no limitation in understanding and memory, as well as in social interaction, although she was sometimes limited in her ability to have sustained concentration and persistence, and to set goals and make plans independently.  AT 274.

On January 20, 2004 Dr. Kristen Barry, a licensed psychologist, conducted an intelligence evaluation regarding the plaintiff.  AT 296-300. In her report of that evaluation Dr. Barry noted plaintiff's claim that her sleep fluctuated, she had bouts of depression and had become withdrawn, she felt anxious and paranoid when she was around many people, and she occasionally heard voices.  AT 297.  Dr. Barry also noted that plaintiff's speech was adequate, she could recall and understand instructions, attention and concentration was fair, and she worked in a deliberate, orderly fashion on tasks.  AT 298.  Dr. Barry assigned the plaintiff a verbal IQ of 93, with a performance IQ of 94, placing her in the average range.  *Id.*  Dr. Barry concluded that plaintiff was able to follow and understand simple directions and instructions, maintain attention and concentration, and manage her own funds.  AT 299.  She also noted that

plaintiff functioned in the average range intellectually, but that she had a long history of emotional problems.  *Id.*  On that occasion Dr. Barry diagnosed the plaintiff with bipolar disorder with psychosis, recommended medical follow-up and continuation of psychiatric medication and counseling, and stated that her prognosis was guarded.  *Id.*

Dr. Barry also conducted a psychiatric examination of the plaintiff on that same date.  AT 301-05.  In her report of that evaluation, Dr. Barry observed that plaintiff's speech was fluent and clear, her thought processes were coherent and goal directed with no evidence of hallucinations, delusions, or paranoia, and her affect was of full range and appropriate to her speech and thought content.  AT 303.  Dr. Barry also found that plaintiff was oriented to person, place, and time, her sensorium was clear, attention and concentration were intact, she could do counting and simple calculations, recent and remote memory skills were grossly intact, intellectual functioning was in the average range, and insight and judgment were fair.  *Id.*  Dr. Barry further noted that plaintiff was able to dress, bathe, and groom herself, she liked cooking, and could manage her own funds, but that she had difficulty keeping up with cleaning and laundry and needed to be reminded to do those chores.  AT 304.  Dr. Barry

diagnosed plaintiff as suffering from bipolar disorder with psychosis, and
concluded that she was able to follow and understand simple directions
and instructions and maintain attention and concentration.  *Id.*  Dr. Barry
again recommended medical follow-up and continuation of psychiatric
medication and counseling, and stated that her prognosis was guarded.
*Id.*

On February 24, 2004, Dr. Jane Stafford, a state agency medical
consultant completed a mental RFC assessment of the plaintiff.  AT 306-
08.  Dr. Stafford concluded that of the twenty categories of mental
functioning examined plaintiff had moderate limitations in ten, including in
her ability to 1) understand and remember detailed instructions; 2) to carry
out detailed instructions; 3) maintain attention and concentration for
extended periods; 4) work in coordination with or proximity to others
without being distracted by them; 5) interact appropriately with the general
public; 6) accept instructions and respond appropriately to criticism from
supervisors; 7) to get along with coworkers or peers without distracting
them or exhibiting behavioral extremes; 8) respond appropriately to
changes in the work setting; 9) travel in unfamiliar places or use public
transportation; and 10) set realistic goals or make plans independently of

others.  AT 306-07.  Dr. Stafford further concluded, however, that plaintiff

was not significantly limited in any other categories.  *Id.*

Contemporaneously with preparation of her mental RFC

assessment, Dr. Stafford also completed a psychiatric review technique

form concerning the plaintiff.  AT 311-23.   In it, Dr. Stafford found that

plaintiff had medically determinable impairments that did not fit the

diagnostic criteria of the various listed impairments, including major

depressive disorder with psychotic features, personality disorder, and

cannabis and alcohol abuse in reported remission.  AT 314, 318-19.  Dr.

Stafford opined that as a result of those conditions plaintiff experienced

mild restrictions on activities of daily living, and moderate difficulties in

maintaining social functioning, concentration, persistence, or pace.  AT

321.  It was further noted that plaintiff never had repeated episodes of

deterioration.[10]  *Id.*

On August 25, 2004, Dr. Apacible and clinical social worker ("CSW")

Judith Arnold completed an interval psychological assessment form with

respect to the plaintiff's condition.  AT 364-66.  In that assessment it was

reported that plaintiff's mood was more exuberant, her attitude was

---

[10]      Dr. Stafford further found that the evidence did not establish the
presence of limitations meeting the "C" criteria of the controlling listings.  AT 322.

cooperative, affect was pleasant with some depression, speech was normal, motor activity was a "little antsy", she was oriented, judgment was fair, insight was fair and improved, intelligence was normal, thought processes were coherent, thought content was improved, there were no hallucinations or delusions, and memory and concentration were good. AT 365.  On the basis of their observations and treatment Dr. Apacible and CSW Arnold concluded that the plaintiff was doing better and making progress, and that her goal was to be independent, diagnosing her with major depressive disorder recurrent with psychotic features, PTSD, as well as cannabis and alcohol abuse and assigning a GAF score of 70.[11] *Id.* In the report it was recommended that the plaintiff continue psychotherapy and medication management.  AT 366.

In February of 2005, Dr. Apacible completed a medical assessment of plaintiff's mental ability to perform work-related activities.  AT 361-62A. In that assessment Dr. Apacible stated that plaintiff had 1) a fair ability to use judgment and maintain personal appearance; 2) serious limitations in her ability to follow work rules, deal with work stresses, function

---

[11]      A GAF score between 61 and 70 reflects the existence of some mild symptoms or some difficulty in social, occupational, or school functioning, but generally indicates that the subject is functioning pretty well and has some meaningful interpersonal relationships.  DSM-IV-TR 34.

independently, understand, remember and carry out simple job instructions, behave in an emotionally stable manner, and demonstrate reliability; and 3) poor to no ability to relate to co-workers, deal with the public, interact with supervisors, maintain attention/concentration, understand, remember and carry out complex job instructions, understand, remember and carry out detailed, but not complex, job instructions, and relate productably in social situations.  *Id.*  Dr. Apacible also opined that plaintiff could not manage benefits in her own best interest.  AT 362A.

In addition to her mental impairments plaintiff has been treated for various physical ailments.  As early as 2001, plaintiff complained of symptoms regarded as being consistent with IBS.  AT 239.  Plaintiff was examined by Dr. Louis P. Mateya, Jr., of United Medical Associates, P.C., on July 9, 2001.  AT 238.  Noting the history of IBS and psychiatric issues, Dr. Mateya observed at that time that plaintiff appeared to be in no distress and that a possible cause of her complaints could be the side affects of Depakote, one of her prescribed psychiatric medications.  *Id.*  In February of 2003, after complaining of blood in her stool, nausea and vomiting, plaintiff was diagnosed by Dr. Leslie Bank with GERD and was

prescribed Protonix and told to take Milk of Magnesia and Metamucil.  AT
345-46.

Plaintiff also sought treatment for left hip and back pain stemming
from an early 2003 fall from a skateboard.  AT 207-10.  X-rays taken at
that time of plaintiff's spine showed no sublaxations or fractures and mild
spurring.  AT 212.  X-rays in plaintiff's left hip and pelvis revealed no
dislocation or fractures.  *Id.*  At that time plaintiff was diagnosed with a
lumbar contusion and back sprain, and was prescribed Tordol and
Norflex.  AT 209-11.

During a follow-up visit early in July of 2003, Dr. Mateya found that
plaintiff had improved but was unwilling and seemingly unable to return to
work.  AT 260.  At that time Dr. Mateya also noted that plaintiff was
reluctant to undertake any further physical therapy due to the financial
burden associated with such treatment.  *Id.*  Further improvement was
noted following an examination by Dr. Mateya on August 19, 2003; in his
notes of that visit Dr. Mateya reported that plaintiff moved more fluently
after three sessions of physical therapy, and while her flexion remained
somewhat limited and there was some loss of lordosis of the LS spine, her
hyperextension, lateral bending and torsion were normal and she stood

-15-

erect with pelvic brim symmetric and level.[12]  AT 230.

Plaintiff has also complained of cracking and grinding in her right knee.  AT 336, 343. During an examination conducted in July of 2004, based upon those complaints, Dr. Mateya found no objective evidence of difficulties and recommended that plaintiff engage in leg and ankle lift exercises and utilize Motrin for pain.  AT 336.  Plaintiff was again examined for complaints of right knee pain by Dr. Mateya on October 7, 2004.  At that time, observing that plaintiff was working as a housekeeper requiring her to engage in a great deal of climbing, bending, and kneeling, and noting the lack of any significant x-ray or test results, Dr. Mateya reported that plaintiff had soft tissue inflammation and prescribed Ketoprofen, with additional use of a knee pad for work and physical therapy.  AT 333.  The following month Dr. Mateya again examined the plaintiff, determining that her range of motion of the spine was good and that the source of her knee pain was probable tibial tendinitis, for which physical therapy was recommended.[13]  AT 332.

_____

[12]     Plaintiff attended physical therapy from August 6, 2003 until September 30, 2003 for pain in her hip and back.  AT 247-55, 257-59.  On her last day of therapy plaintiff's physical therapist, Gauri Bhandari, stated that she had made good progress and was encouraged to continue exercising on her own.  AT 247.

[13]     Plaintiff attended physical therapy in November 2004.  AT 350-51.

On January 20, 2004 plaintiff was examined by a state agency orthopedic consultant, Dr. John Cusick.  AT 203-06.  Based upon his examination and plaintiff's report of her daily activities, Dr. Cusick concluded that plaintiff's prognosis was guarded for her depression, but that she suffered from no discernable physical limitations.  AT 205.

Despite her impairments, plaintiff reports that she occasionally cooks when her mother does not; does the dishes; performs other housework; cares for her personal needs, with reminders from her mother; reads; occasionally uses a computer; and visits with friends.  AT 159-60, 381, 383-84.

II.    PROCEDURAL HISTORY

       A.    Proceedings Before The Agency

Plaintiff filed applications for DIB and SSI benefits on November 24, 2003, alleging disability based upon the combination of her various physical and mental conditions extending back to an attributed onset date of May 12, 2003.[14]  AT 75-77.  Following the denial of the applications at the initial review level, *see* AT 53, 60-65, a hearing was conducted, at

---

[14]     Plaintiff previously filed applications for DIB and SSI benefits on May 29, 2003.  AT 72-74.  Those applications were initially denied, however, and no request for a hearing was filed, nor was any further action taken concerning those earlier applications.  AT 54-59.

plaintiff's request, before ALJ James J. Quigley to address plaintiff's claim for benefits.  *See* AT 375-94.  Testifying at that hearing were the plaintiff, who was represented by counsel, and David Festa, a vocational expert. *Id.*

On April 25, 2005, ALJ Quigley issued a written decision finding that plaintiff was not disabled, and accordingly denying her claim for benefits. AT 18-30.  After conducting a *de novo* review of plaintiff's applications, informed by the medical and other evidence amassed and the testimony adduced, ALJ Quigley applied the now familiar five part sequential test for determining disability, concluding at step one that plaintiff had not engaged in substantial gainful activity since her alleged disability onset date.  AT 22.  At steps two and three of the disability algorythim, the ALJ concluded that plaintiff's major depressive disorder with psychotic features, bipolar disorder, personality disorder, and PTSD were impairments of sufficient severity to significantly restrict her ability to perform basic work activities, but that they did not meet or equal any of the listed, presumptively disabling impairments set forth in the governing regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1.  AT 23.  In making that determination, ALJ Quigley discounted plaintiff's back and leg injuries,

IBS, GERD, and history of cannabis and alcohol abuse as not being of sufficient severity to meet the step two test, finding that they posed no more than minimal limitations on her ability to perform work functions for any appreciable period of time, much less over twelve continuous months. *Id.*

Before proceeding to step four of the sequential analysis, ALJ Quigley determined that despite the limitations imposed by her mental conditions, plaintiff retains the residual functional capacity ("RFC") to perform the requirements of work at all exertional levels, provided that she is required to have no more than brief, superficial contact with co-workers and no interaction with the general public, and that it is recognized that she can understand, remember, and carry out only simple instructions and make only simple work-related decisions. AT 27. In making that determination, ALJ Quigley relied upon medical evidence in the record, including reports generated by treating and evaluating physicians, and rejected plaintiff's subjective testimony, to the extent that it was inconsistent with that finding, as not entirely credible based upon the lack of objective medical evidence suggesting that her impairments are of sufficient severity to cause the symptoms reported. AT 23-27.

Applying that RFC finding, ALJ Quigley determined that plaintiff is unable to perform her past relevant work due to her mental limitations but, relying upon the medical-vocational guidelines (the "grid") set forth in the applicable regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 2, as a framework, augmented by the testimony of a vocational expert to address erosion of the job base upon which the grid is predicated based upon plaintiff's non-exertional limitations, nonetheless concluded that there is available work within the national and local economies which plaintiff is capable of performing including, *inter alia*, as a racker and final assembler.  AT 28.  ALJ Quigley thus concluded that plaintiff is not disabled and, accordingly, denied her applications for disability insurance and SSI benefits.  AT 28-29.  ALJ Quigley's opinion became a final determination of the agency on September 16, 2005, when the Social Security Administration Appeals Council denied her request for review of that decision.  AT 5-7.

B.     This Action

Plaintiff commenced this action on November 18, 2005.  Dkt. No. 1.  Issue was thereafter joined on February 9, 2006 by the Commissioner's filing of an answer, accompanied by a copy of an administrative transcript

of the proceedings and evidence before the agency.  Dkt. Nos. 3, 4.  With

the filing on March 27, 2006 of plaintiff's brief, Dkt. No. 5, and that on

behalf of the Commissioner on May 1, 2006, Dkt. No. 6, the matter is now

ripe for determination, and has been referred to me for the issuance of a

report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and

Northern District of New York Local Rule 72.3(d).[15]  *See also* Fed. R. Civ.

P. 72(b).

III.    DISCUSSION

     A.    Scope of Review

_____A court's review under 42 U.S.C. § 405(g) of a final decision by the

Commissioner is limited; that review requires a determination of whether

the correct legal standards were applied, and whether the decision is

supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586

(2d Cir. 2002); *Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir. 2000); *Schaal

v. Apfel,* 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F. Supp.

---

[15]    This matter has been treated in accordance with the procedures set forth
in General Order No. 18 (formerly, General Order No. 43) which was issued by the
Hon. Ralph W. Smith, Jr., Chief United States Magistrate Judge, on January 28, 1998,
and subsequently amended and reissued by Chief District Judge Frederick J. Scullin,
Jr., on September 12, 2003.  Under that General Order an action such as this is
considered procedurally, once issue has been joined, as if cross-motions for judgment
on the pleadings had been filed pursuant to Rule 12(c) of the Federal Rules of Civil
Procedure.

2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).   Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, his decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence.  *Martone*, 70 F. Supp. 2d at 148.  If, however, the correct legal standards have been applied and the ALJ's findings are supported by substantial evidence, those findings are conclusive, and the decision should withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact.  *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel,* 13 F. Supp. 2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)); *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003).  To be substantial, there must be "'more than a mere

scintilla'" of evidence scattered throughout the administrative record. *Richardson*, 402 U.S. at 401, 91 S. Ct. at 1427; *Martone,* 70 F. Supp. 2d at 148 (citing *Richardson*).  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 715 S. Ct. 456, 464 (1951)).

When a reviewing court concludes that incorrect legal standards have been applied, and/or that substantial evidence does not support the agency's determination, the agency's decision should be reversed.  42 U.S.C. § 405(g); *see Martone*, 70 F. Supp. 2d at 148.  In such a case the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning.  *Martone*, 70 F. Supp. 2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  A remand pursuant to sentence six of section 405(g) is warranted if new, non-cumulative evidence proffered to the district court should be

considered at the agency level.  *See Lisa v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without remand, while unusual, is appropriate when there is "persuasive proof of disability" in the record and it would serve no useful purpose to remand the matter for further proceedings before the agency.  *Parker*, 626 F.2d at 235; *Simmons v. United States R.R. Ret. Bd.,* 982 F.2d 49, 57 (2d Cir. 1992); *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983).

>    B.    Disability Determination - The Five Step Evaluation Process

The Social Security Act defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A). In addition, the Act requires that a claimant's

> physical or mental impairment or impairments
> [must be] of such severity that he is not only
> unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of substantial
> gainful work which exists in the national economy,
> regardless of whether such work exists in the
> immediate area in which he lives, or whether a

-24-

> specific job vacancy exists for him, or whether he
> would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

The agency has prescribed a five step evaluative process to be employed in determining whether an individual is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The first step requires a determination of whether the claimant is engaging in substantial gainful activity; if so, then the claimant is not disabled, and the inquiry need proceed no further.  *Id.* §§ 404.1520(b), 416.920(b).   If the claimant is not gainfully employed, then the second step involves an examination of whether the claimant has a severe impairment or combination of impairments which significantly restricts his or her physical or mental ability to perform basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations.  *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1.  If so, then the claimant is "presumptively disabled".  *Martone*, 70 F. Supp. 2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an

assessment of whether the claimant's residual functional capacity ("RFC") precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If it is determined that it does, then as a final matter the agency must examine whether the claimant can do any other work.  *Id.* §§ 404.1520(f), 416.920(f).

The burden of showing that the claimant cannot perform past work lies with the claimant.  *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584.  Once that burden has been met, however, it becomes incumbent upon the agency to prove that the claimant is capable of performing other work.  *Perez*, 77 F.3d at 46.  In deciding whether that burden has been met, the ALJ should consider the claimant's RFC, age, education, past work experience, and transferability of skills.  *Ferraris*, 728 F.2d at 585; *Martone*, 70 F. Supp. 2d at 150.

    C.    <u>The Evidence In This Case</u>

        1.    <u>Treating Physician Rule</u>

Plaintiff contends that the ALJ's analysis is flawed based upon his improper and unexplained rejection of a report generated by her treating psychiatrist, Dr. Apacible.  Plaintiff specifically challenges the ALJ's rejection of Dr. Apacible's 2005 assessment, arguing that it should have

been accorded controlling weight or, at a minimum, provided a basis for the ALJ to recontact that physician for further input.

Ordinarily, the opinion of a treating physician is entitled to considerable deference, provided that it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.  *Veino*, 312 F.3d at 588; *Barnett*, 13 F. Supp. 2d at 316.[16]  Such opinions are not controlling, however, if contrary to other substantial evidence in the record, including the opinions of other medical experts.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino*, 312 F.3d at 588.  Where conflicts arise in the form of contradictory medical evidence, their resolution is properly

_____

[16]    The regulation which governs treating physicians provides:

> Generally, we give more weight to opinions
> from your treating sources . . . If we find that a
> treating source's opinion on the issue(s) of the
> nature and severity of your impairment(s) is
> well-supported by medically acceptable
> clinical and laboratory diagnostic techniques
> and is not inconsistent with the other
> substantial evidence in your case record, we
> will give it controlling weight.   When we do
> not give the treating source's opinion
> controlling weight, we apply [various factors]
> in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

entrusted to the Commissioner.  *Veino*, 312 F.3d at 588.  In deciding what weight, if any, an ALJ should accord to medical opinions, he or she may consider a variety of factors including "[t]he duration of a patient-physician relationship, the reasoning accompanying the opinion, the opinion's consistency with other evidence, and the physician's specialization or lack thereof[.]"  *See Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (discussing 20 C.F.R. §§ 404.1527, 416.927).

When a treating physician's opinions are repudiated, the ALJ must provide reasons for the rejection.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Compliance with this requirement serves to assist a reviewing court to discern the weight given to a treating physician's opinions and, if rejected, the reasoning employed.  *Halloran,* 362 F.3d at 32-33.  Failure to apply the appropriate legal standards for considering a treating physician's opinions is a proper basis for reversal and remand, as is the failure to provide reasons for rejection of his or her opinions. *Johnson*, 817 F.2d at 985-86; *Barnett*, 13 F. Supp. 2d at 316-17.

Plaintiff contends that the ALJ improperly refused to accord Dr. Apacible's February, 2005 assessment, including notably his conclusions that plaintiff had poor to no ability to do work-related activities, controlling

-28-

weight, further arguing that in his treatment of that opinion the ALJ acted

contrary to Social Security Ruling 96-2p.[17]  Plaintiff also claims that state

agency assessments, in particular that of Dr. Barry, should not have been

accorded substantial weight and elevated in significance above those of

Dr. Apacible since they were opinions from mere non-examining sources.

Careful review of the ALJ's determination reflects that, contrary to

plaintiff's suggestion, ALJ Quigley did not reject all of Dr. Apacible's

findings.  The ALJ's rejection was specifically limited to Dr. Apacible's

2005 assessment, in which he reported that plaintiff had 1) a fair ability to

use judgment and maintain personal appearance; 2) serious limitations in

her ability to follow work rules, deal with work stresses, function

independently, understand, remember and carry out simple job

instructions, behave in an emotionally stable manner, and demonstrate

reliability; and 3) poor to no ability to relate to co-workers, deal with the

public, interact with supervisors, maintain attention/concentration,

understand, remember and carry out complex, or even detailed but not

---

[17]     Social Security Ruling 96-2p was promulgated to address evaluation of medical opinions and to reflect "when treating source medical opinions are entitled to controlling weight, and to clarify how the policy is applied."  Social Security Ruling ("S.S.R.") 96-2p, 1996 WL 374188, at *1, *Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions* (S.S.A. 1996).

complex, job instructions, and relate productably in social situations.  AT 361-362A.

In rejecting that assessment as worthy of little weight, the ALJ properly illuminated his reasoning for doing so, and did not err.   While plaintiff clearly suffers from mental impairments, the limitations described in Dr. Apacible's 2005 assessment as attributable to those impairments comes in stark contrast to other findings made by him, and lacks support of substantial evidence in the record.  *See* AT 288-89.  When a treating physician's opinions are inconsistent with other substantial evidence in the record, and indeed even his or her own treatment notes, as is the case in this instance, an ALJ may properly discount those opinions.  *Halloran,* 362 F.3d at 32; *see also* SSR 96-2p.  Such a conclusion provides a proper basis under SSR 96-2p for rejecting a treating physician's conclusion.

In contrast to the 2005 assessment, in June of 2002 Dr. Apacible noted that plaintiff was calm and cooperative, her speech was relevant, memory was intact, level of functioning was average, affect was appropriate, mood was a little sad and anxious at times, there were no hallucinations, she did not have suicidal or homicidal ideations, and judgment was fair.  AT 288-89.  He further stated that plaintiff's GAF score

-30-

was 60, which connotes the existence of only moderate mental health symptoms or moderate difficulties in social, occupational or school functioning.

Nearly a year later, on June 2, 2003, Dr. Apacible opined that the plaintiff was calm and cooperative, her thoughts were disorganized, affect was appropriate, she was sad at times, she was oriented and had fair knowledge, she could do simple calculations, and judgment was fair.  AT 283-84.  Dr. Apacible also reported that she had no suicidal features, she could handle payment benefits, she was able to follow simple directions, and her concentration and persistence could be limited at times due to depression.  AT 285-86.

On December 4, 2003, Dr. Apacible again opined that plaintiff's affect was appropriate, mood was sad and depressed at times, she was oriented, memory was intact, she could do simple calculations, judgment was fair, there were no suicidal features present, and she was capable of handling payment benefits.  AT 272-73.  He also found she had no limitation in understanding and memory and social interaction, although she was sometimes limited in her ability to have sustained concentration and persistence, set goals, and make plans independently.  AT 274.

Significantly, in an opinion rendered only a few months prior to the 2005 assessment, Dr. Apacible reported that plaintiff's mood was more exuberant, her attitude was cooperative, affect was pleasant with some depression, speech was normal, motor activity was a little antsy, she was oriented, judgment was fair, insight was fair and improved, intelligence was normal, thought processes were coherent, thought content was improved, there were no hallucinations or delusions, and memory and concentration were good.  AT 365.  Dr. Apacible also stated that the plaintiff was doing better, making progress, and her goal was to be independent.  *Id.*  At that point Dr. Apacible assessed a GAF score of 70, which indicates the existence of some mild symptoms or some difficulty in social, occupational, or school functioning, but generally means the person is functioning pretty well and has some meaningful interpersonal relationships.  *See* DSM-IV-TR 34.

These findings, particularly given the lack of any indication of significant deterioration in plaintiff's condition between the time of those reports and the date of the rejected Dr. Apacible assessment, provided a proper basis for rejection of that report as controlling, notwithstanding that it originated from a treating source.

-32-

The ALJ's rejection of Dr. Apacible's report also garners support from other evidence in the record.  On April 18, 2002, clinical social worker Karen Marganas stated that plaintiff was feeling good, sleeping better, and able to manage her money, and that her affect was brightened.  AT 200.  In a therapy session held on May 10, 2002, it was reported that plaintiff's insight and judgment were good and there was no evidence of delusions.  *Id.*  A GAF score of 60 was assessed.  *Id.*

In May and June 2002, a staff psychiatrist and clinical social worker from Broome County Community Mental Health Services found that plaintiff was oriented, her long and short term memory as well as concentration were intact, intelligence was above average with good insight potential, affect was blunted, mood was depressed, thought processes were logical and coherent, there were no delusions nor hallucinations, and she had no suicidal nor homicidal ideation.  AT that time plaintiff was assigned a GAF score of 55.  AT 292.

The ALJ's rejection of Dr. Apacible's 2005 assessment is also supported by opinions of state agency medical consultant Dr. Kusum Walia.  AT 213-14.  While in his report Dr. Walia opined that plaintiff is moderately limited in certain categories mental functioning, he also found

-33-

that she was not significantly limited in her ability to 1) remember locations and work-like procedures; 2) understand and remember very short and simple instructions; 3) carry out very short and simple instructions; and 4) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  *Id.*  Dr. Walia further opined that plaintiff has mild restrictions on activities of daily living and moderate difficulties in maintaining social functioning, concentration, persistence, or pace.  AT 226.  Dr. Jane Stafford, another state agency consultant, rendered nearly the same findings in February of 2004, other than noting that plaintiff is moderately limited in ten categories of mental functioning, as opposed to the sixteen found by Dr. Walia.  AT 306-08, 321.

In addition to confirming that Dr. Apacible's 2005 assessment was deserving of little if any weight, those agency findings lend support to Dr. Barry's opinions.  On January 20, 2004, Dr. Barry stated that plaintiff's speech was adequate, she could recall and understand instructions, attention and concentration was fair, and she worked in a deliberate orderly fashion on tasks.  AT 298.  She also opined that plaintiff's speech was fluent and clear, her thought processes were coherent and goal directed with no evidence of hallucinations, delusions, or paranoia, and

her affect was of full range and appropriate to her speech and thought content.  AT 303.  Dr. Barry further stated that plaintiff was oriented to person, place, and time, her sensorium was clear, attention and concentration were intact, she could do counting and simple calculations, recent and remote memory skills were grossly intact, intellectual functioning was in the average range, and insight and judgment were fair. *Id.*  She further noted that plaintiff was able to dress, bathe, and groom herself, she liked cooking, and she could manage her own funds.  AT 304.

The opinions of state agency consultative examiners may constitute substantial evidence to support an ALJ's determination, provided that there is other supporting evidence in the record.  *See* 20 C.F.R. § 404.1527(f), 416.927(f); *see also Brunson v. Barnhart*, No. 01-CV-1829, 2002 WL 393078, at *14 (E.D.N.Y. Mar. 14, 2002) (noting that the opinions of non-examining sources may be considered provided they are supported by evidence in the record).  In this case, the opinions of Dr. Barry and the other consultants are supported by substantial evidence in the record.

In sum, the ALJ's decision not to accord deference to the isolated, 2005 opinion of Dr. Apacible, and instead to accord substantial weight to

the opinions of the consultative examiners as well as Dr. Apacible's earlier

findings, is well-supported.[18]

### 2.   Plaintiff's Credibility

In a report provided to the New York State Office of Temporary and

Disability Assistance in connection with her application, and again during

her hearing, plaintiff claimed to experience non-exertional limitations as a

result of her mental conditions, including the ability to concentrate and

remember, nervousness around people, and anxiety.  AT 121-22, 380.

Relying principally upon the extent of plaintiff's daily activities, and finding

that despite her mental limitations plaintiff is capable of performing her

---

[18]      Plaintiff also argues that the ALJ should have re-contacted Dr. Apacible
for clarification of his assessment, instead of assigning it little weight.  When
confronted with a claim for Social Security benefits, an ALJ is tasked by statute with
the responsibility to develop a claimant's complete medical history for at least twelve
months prior to the filing of an application for benefits, and additionally "to gather such
information for a longer period if there [is] reason to believe that the information [is]
necessary to reach a decision."  *DeChirico v. Callahan,* 134 F.3d 1177, 1184 (2d Cir.
1998) (citing 42 U.S.C. § 423(d)(5)(B), as incorporated by 42 U.S.C. § 1382c(a)(3)(G),
and 20 C.F.R. § 416.912(d)).  In furtherance of the duty to develop the record, an ALJ
may re-contact medical sources if the evidence received from the treating physician or
other medical sources is inadequate to determine disability and additional information
is needed to reach a determination.  20 C.F.R. §§ 404.1512(e), 416.912(e).

In this case the plaintiff was represented by an attorney who had reviewed the
medical records adduced during the hearing, failing to point out any deficiencies to the
ALJ.  In any event it is clear, based on the existence in the record of multiple medical
opinions from several different sources concerning plaintiff's mental impairments, that
there are no critical gaps in the record.  The ALJ was therefore not obligated to re-
contact Dr. Apacible.

activities of daily living, ALJ Quigly rejected those complaints as not fully credible.  AT 23-24, 29.

An ALJ must take into account subjective complaints of claimant's limitations in making the five step disability analysis.  20 C.F.R. §§ 404.1529(a), (d), 416.929(a), (d).  When examining that issue, however, the ALJ is not required to blindly accept the subjective testimony of a claimant.  *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979); *Martone*, 70 F. Supp. 2d at 151 (citing *Marcus*).  Rather, an ALJ retains the discretion to evaluate a claimant's subjective testimony, including testimony concerning non-exertional limitations.  *See Mimms v. Heckler*, 750 F.2d 180, 185-86 (2d Cir. 1984).  In deciding how to exercise that discretion the ALJ must consider a variety of factors which ordinarily would be relevant on the issue of credibility in any context, including the claimant's credibility, his or her motivation, and the medical evidence in the record. *See Sweatman v. Callahan*, No. 96-CV-1966, 1998 WL 59461, at *5 (N.D.N.Y. Feb. 11, 1998) (Pooler, D.J. and Smith, M.J.) (citing *Marcus*, 615 F.2d at 27-28)).  In doing so, the ALJ must reach an independent judgment concerning the actual extent of any non-exertional limitation suffered and its impact upon the claimant's ability to work.  *Id.*

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony.  *Martone*, 70 F. Supp. 2d at 151; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  If such testimony is rejected, however, the ALJ must explicitly state the basis for doing so with sufficient particularity to enable a reviewing court to determine whether those reasons for disbelief were legitimate, and whether the determination is supported by substantial evidence.  *Martone*, 70 F. Supp. 2d at 151 (citing *Brandon v. Bowen,* 666 F. Supp. 604, 608 (S.D.N.Y. 1987)).  Where the ALJ's findings are supported by substantial evidence, the decision to discount subjective testimony may not be disturbed on court review.  *Aponte v. Sec'y, Dep't of Health & Human Servs.,* 728 F.2d 588, 591 (2d Cir. 1984).

In this case, the issue of plaintiff's credibility relates solely to the ALJ's findings regarding her non-exertional impairments.  Non-exertional limitations refer to limitations affecting the claimant's ability to meet the requirements of a job other than strength demands.  20 C.F.R. §§ 404.1569a(c), 416.969a(c).  This includes, *inter alia*, limitations or restrictions in functioning due to nervousness, anxiety or depression,

maintaining attention or concentration, understanding or remembering

detailed instructions, and performing manipulative or postural functions

such as reaching, handling, stooping, climbing, crawling, or crouching.

*Id*.; *see also* S.S.R. 83-14, 1983 WL 31254, at * 1, *Program Policy*

*Statement–Titles II and XVI: Capability to do Other Work – The Medical*

*Vocational Rules as a Framework for Evaluating a Combination of*

*Exertional and Nonexertional Impairments* (S.S.A. 1983).

    Considering the evidence before him, the ALJ found plaintiff's

statements concerning her mental impairments and their impact on her

ability to work not to be entirely credible, at least to the extent alleged,

based upon the overall evidence of record, the positive response to

medications, and descriptions of her daily activities.  While plaintiff clearly

suffers from medically determinable impairments, her reports of non-

exertional mental limitations are far more extensive than the objective

evidence alone would suggest.  As example of this, plaintiff reported that

she was unable to work after May 12, 2003 due to her mental ailments.

AT 75, 379.  Yet, in 2004 plaintiff obtained a job as a housekeeper.  AT

364.  Plaintiff also testified that she was afraid of being around people, but

stated to her treating psychiatrist that she was taking the bus.  AT 364,

380.  Plaintiff further testified that she lacked motivation to get up and go to work.  AT 380.  In August of 2004, however, Dr. Apacible noted in his report that plaintiff seemed more confident and motivated to get a job.  AT 364.

At the administrative hearing plaintiff reported that she began living with her parents because it was too difficult to be responsible for bills and other such things.  AT 382.  Nonetheless, CSW Marganas, Dr. Apacible, and Dr. Barry all found that plaintiff could manage her own funds.  AT 200, 273, 299, 304.  Moreover, Drs. Walia and Stafford both opined that plaintiff had only mild restrictions on activities of daily living.  AT 226, 321. Drs. Barry and Cusick also noted that plaintiff was able to dress, bathe, and groom herself as well as cook, and Dr. Cusick further reported that plaintiff could clean, do the laundry, and shop.  AT 204, 304.

Notwithstanding the ALJ's finding that plaintiff's symptomology was not as extensive as alleged, the ALJ clearly did not discount the limiting effects of her non-exertional impairments altogether.  As was noted above, plaintiff's non-exertional impairments include limitations or restrictions in functioning due to nervousness, anxiety or depression, maintaining attention or concentration, and understanding or remembering

detailed instructions.  The medical records substantiate that plaintiff has limitations in these areas.  For this reason, the ALJ concluded in his RFC determination that plaintiff was to have "no more than brief, superficial contact with co-workers and no interaction with the general public."  AT 27.  The ALJ also found that she was able to understand, remember, and carry out no more than simple instructions and make simple work-related decisions.  *Id.*  Moreover, these limitations were built into the hypothetical presented to the vocational expert.

Based on the medical evidence in the record, I conclude that the ALJ did not err in making his credibility determination.  The ALJ both considered plaintiff's non-exertional impairments, and discussed the relevant factors set forth in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  *Cf. Tornatore v. Barnhart*, No. 05 Civ. 6858, 2006 WL 3714649, at *6 (S.D.N.Y. Dec. 12, 2006).  I therefore find, based upon review of the record, that the ALJ's determination that plaintiff's reports of the extent of her symptomology are not entirely credible is both well-articulated, and supported by substantial evidence in the record.[19]

---

[19]      In the "findings" portion of his decision, ALJ Quigley stated that he did not find the plaintiff's allegations regarding her impairment and resulting limitations to be entirely credible.  AT 29.  In the body of his decision, however, the ALJ did not pointedly address the question of credibility, nor does it appear that he engaged in the

### 3.    Plaintiff's RFC

The foundation for ALJ Quigley's finding of no disability is his

conclusion regarding plaintiff's RFC.  Plaintiff maintains that the ALJ's

RFC determination was flawed based upon his failure to account for any

of plaintiff's physical limitations, and to adequately take into account the

severity of her mental limitations.

A claimant's RFC represents a finding of the range of tasks he or

she is capable of performing notwithstanding the impairments at issue.  20

C.F.R. §§ 404.1545(a), 416.945(a).  An RFC determination is informed by

consideration of a claimant's physical abilities, mental abilities,

symptomology, including pain, and other limitations which could interfere

with work activities on a regular and continuing basis.  *Id.*; *Martone*, 70 F.

Supp. 2d at 150.

---

analysis required under Social Security Ruling ("SSR") 96-7p before discounting
plaintiff's statements regarding her limitations.  Since it is not at all clear that the ALJ
did in fact reject any significant testimony of limitations substantially greater than those
found in the hypothetical posed to the vocational expert, resulting in his opinion that
plaintiff is able to perform available work within the national economy, at best this
potential shortcoming constitutes harmless error.  *See generally Fischer-Ross v.
Barnhart*, 431 F.3d 729, 733-34 (10th Cir. 2005) (indicating that harmless error
analysis is appropriate "to supply a missing dispositive finding . . . where, based on
material the ALJ did at least consider (just not properly), we could confidently say that
no reasonable administrative factfinder, following the correct analysis, could have
resolved the factual matter in any other way") (quotations and citation omitted).

To properly ascertain a claimant's RFC, an ALJ must therefore assess plaintiff's exertional capabilities, addressing his or her ability to sit, stand, walk, lift, carry, push and pull.  20 C.F.R. §§ 404.1545(b), 404.1569a, 416.945(b), 416.969a.  Non-exertional limitations or impairments, including impairments which result in postural and manipulative limitations, must also be considered.  20 C.F.R. §§ 404.1545(b), 404.1569a; *see also* 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e).  When making an RFC determination, an ALJ must specify those functions which the claimant is capable of performing; conclusory statements concerning his or her capabilities, however, will not suffice. *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris,* 728 F.2d at 587).  An administrative RFC finding can withstand judicial scrutiny only if there is substantial evidence in the record to support each requirement listed in the regulations.  *Martone*, 70 F. Supp. 2d at 150 (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Sobolewski v. Apfel*, 985 F. Supp. 300, 309-10 (E.D.N.Y. 1997).

Addressing plaintiff's RFC, ALJ Quigley determined that she is capable of performing "the non-exertional requirements of work at all exertional levels that requires no more than brief, superficial contact with

co-workers and no interaction with the general public." AT 27.

Additionally, the ALJ stated she was able to understand, remember, and

carry out no more than simple instructions and make simple work-related

decisions, and found that plaintiff experienced no exertional limitations or

restrictions. *Id.*

      Insofar as they relate to alleged exertional limitations, plaintiff's RFC

arguments can be swiftly discounted. The record is wholly devoid of any

evidence from any source – treating or non-treating – to suggest that

plaintiff's physical conditions present more than minimal limitation on her

ability to perform work-related functions over a continuous period of twelve

months or more. That finding is confirmed by opinions rendered by Dr.

Cusik, following his orthopedic examination, in which he found that plaintiff

was not limited in any way from performing work-related functions. *See*

AT 205.

      The arguments related to the effects of plaintiff's mental conditions

upon her ability to perform non-exertional work-related activities have

already been dealt with previously in this report.[20] Since the ALJ's

findings regarding plaintiff's RFC are supported by substantial evidence, I

---

[20]     *See* pp. 40-47, *ante*.

recommend rejection of this argument.

4.   Testimony of Vocational Expert

_____As an extension of her RFC argument, plaintiff maintains that the ALJ's error was compounded when testimony was elicited from the testifying vocational expert based upon an unsupported hypothetical question.

It is well-established that elicitation of testimony from a vocational expert is a proper means of fulfilling the agency's burden at step five of the disability test to establish the existence of jobs in sufficient numbers in the national and regional economies that plaintiff is capable of performing. *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983); *Dwyer v. Apfel*, 23 F. Supp. 2d 223, 229-30 (N.D.N.Y. 1998) (Hurd, M.J.) (citing *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)); *see also* 20 C.F.R. §§ 404.1566, 416.966.  Use of hypothetical questions to develop the vocational expert's testimony is also permitted, provided that the questioning precisely and comprehensively includes each physical and mental impairment of the claimant accepted as true by the ALJ.  *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  If the factors set forth in the

hypothetical are supported by substantial evidence, then the vocational expert's testimony may be relied upon by the ALJ in support of a finding of no disability. *Id.*

Inasmuch as I have determined that the ALJ's RFC finding was supported by substantial evidence, and the hypothetical posed to Vocational Expert Festa was congruent with that RFC finding, I find no error in the finding of no disability based upon the vocational expert's testimony. Moreover, the mere fact that the ALJ stated in the hypothetical that there should be no interaction with the public, although "it could be around or in the presence of the general public[,]" AT 386, does not render the hypothetical improper. The medical records show that plaintiff had moderate limitations in interacting with the public, which the ALJ clearly took into account in stating that plaintiff was to have no interaction with the public. *See* AT 213A, 226, 307, 321.

Plaintiff additionally argues that the second hypothetical presented, in which the ALJ included an inability to remember, understand, and carry out no more than simple instructions and make simple work-related decisions on a consistent basis due to interruption from her psychologically-based symptoms, was instead proper, as the response

elicited from the vocational expert was that a person would not be able to work on a full-time sustained basis.  AT 387.  It should be noted, however, that Dr. Stafford found that plaintiff was not significantly limited in the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  AT 307. Although Dr. Walia expressed a belief that the plaintiff was moderately limited in this category, the remaining medical evidence shows that both suppositions could be supported.  *See* AT 200, 272-74, 283-86, 288-92, 298-99, 303-04, 365.  In such cases "[w]here there is substantial evidence to support either position, the determination is one to be made by the factfinder[, the ALJ]."  *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) (citing, *inter alia*, *Schisler v. Bowen*, 851 F.2d 43, 47 (2d Cir. 1988)). Thus, the ALJ's decision to adhere to the conclusion based on the first hypothetical, instead of the second, was proper.

In sum, the vocational expert's opinion provides support for the conclusion that the Commissioner carried his burden at step five of the disability catechism.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

_____While by all accounts plaintiff suffers from diagnosed mental conditions, some of which impose not insignificant limitations on her ability to secure and perform the required work-related functions of gainful employment, ALJ Quigley properly found that plaintiff is capable of performing work at all exertional levels with restrictions based upon her mental limitations.  In arriving at that conclusion, the ALJ properly determined that plaintiff's allegations of the severity of her symptoms were not entirely credible and rejected, to the limited extent that it may be deemed contradictory, a conflicting report of plaintiff's treating psychiatrist. And, since the finding of disability resulted from the testimony of the vocational expert based upon a hypothetical closely approximating plaintiff's RFC and a finding that jobs in sufficient numbers exist in the national and local economies which plaintiff is capable of performing, the ALJ's determination of no disability was proper.  It is therefore hereby

RECOMMENDED, that defendant's motion for judgment on the pleadings be GRANTED, the Commissioner's determination of no disability AFFIRMED, and plaintiff's complaint DISMISSED in all respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within

which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:      June 10, 2008
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge